UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                             :

AMERICAN FEDERATION OF STATE,     :
COUNTY AND MUNICIPAL EMPLOYEES  :
DISTRICT COUNCIL 37 HEALTH &      :
SECURITY PLAN and SERGEANTS       :
BENEVOLENT ASSOCIATION HEALTH   :
AND WELFARE FUND, individually and on :       12 Civ. 2238 (JPO)
behalf of all others similarly situated,   :
                       Plaintiffs,  :      MEMORANDUM AND
                               :          ORDER
             -against-            :
                               :
BRISTOL-MYERS SQUIBB CO. and OTSUKA :
AMERICA PHARMACEUTICAL, INC.,    :
                    Defendants.  :
                               :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      This case arises from the latest chapter in an ongoing dispute between health insurers and

branded drug manufacturers.  Insurers are keen to control drug costs, while manufacturers are

determined to maintain market share while competing with generics and therapeutic alternatives.

In recent years, manufacturers have launched programs through which they offer to cover the

cost of co-payment obligations for their branded drugs.  Insurers, which create tiered co-pay

obligations to encourage plan members to select cheaper drugs, oppose these programs and argue

that they increase overall drug costs.  That policy dispute produced this lawsuit, which is one of

several similar suits pending in jurisdictions across the country.  Plaintiffs argue that the co-pay

subsidy program is illegal under the federal racketeering and antitrust laws.  Defendants have

filed a motion to dismiss pursuant to Rules 9(b) and 12(b)(6).  The Court held oral argument on

this motion on May 10, 2013.  For the reasons that follow, Defendants' motion is granted and

Plaintiffs are granted leave to re-plead with respect to a portion of their RICO claim.[1]

I.      **Background**[2]

Plaintiff American Federation of State, County and Municipal Employees District

Council 37 Health & Security Plan ("DC 37") administers a variety of self-insured health and

welfare benefits to its more than 125,000 members, including a prescription drug benefit plan

that contains cost-sharing provisions for plan members.  Plaintiff Sergeants Benevolent

Association Health and Welfare Fund ("Sergeants") is an employee welfare benefit plan that

provides comprehensive health care benefits to approximately 12,000 individuals.  Its

prescription drug benefit plan also contains cost-sharing provisions for plan members.

These cost-sharing provisions are intended to place a personal financial obligation on

plan members through a tiered co-payment ("co-pay") scheme that places branded drugs in a less

preferred position than other commonly prescribed therapeutic or AB-rated generic alternatives.

By requiring plan members to provide a higher co-pay for drugs in higher tiers, third party

payers ("TPPs") such as Plaintiffs seek to incentivize plan members to select cost-effective

treatment and medication.  Therapeutic alternatives and AB-rated generics are often more cost-

---

[1] Defendants' motion at Dkt. No. 36 for leave to file excess pages is hereby granted.

[2] The facts alleged in the Complaint are taken as true for purposes of this motion to dismiss and all reasonable inferences are drawn in Plaintiffs' favor.  The Complaint, and the parties, devote a great deal of energy to arguing the policy merits of co-pay subsidies.  To the extent that the facts alleged in support of these policy arguments do not bear on the legal analysis of Plaintiffs' claims, those facts are excluded from this background section.

effective than brand name drugs because, on average, generic prescriptions cost payers $16, preferred brand prescriptions cost $118, and non-preferred brands cost $124.[3]

Defendants Bristol-Myers Squibb Co. ("BMS") and Otsuka American Pharmaceutical, Inc. ("Otsuka") jointly market the branded drug Abilify (aripiprazole), a drug approved to treat schizophrenia. Since 2010, Defendants have provided co-pay subsidies—via the Abilify Savings Card—to insured individuals who are prescribed Abilify.[4] McKesson Corporation administers the co-pay subsidy program for Abilify; this program is known as LoyaltyScript and serves more than 17,000 patients every day. McKesson is not a defendant in this action, but is alleged to be an unnamed coconspirator. In December 2011, as part of their co-pay subsidy program, BMS and Otsuka extended an offer of $100 off per refill for seventeen refills, though patients are not eligible if they have filled more than one prescription for Abilify in the past sixty days. Plaintiffs allege that the purpose of this co-pay subsidy scheme, whereby Defendants knowingly offer and pay remuneration in the form of co-pay subsidies to patients to induce them to purchase Defendants' brand name drug, is to encourage patients and doctors to choose Abilify rather than less expensive therapeutic alternatives.[5]

The existence of co-pay subsidy schemes is "open and notorious." Indeed, co-pay subsidy administration has become a "cottage industry," and BMS is not the only branded drug manufacturer to maintain a co-pay subsidy program. Though the details vary, co-pay subsidy

---

[3] AB-rated generics are, by definition, substitutable for their branded equivalents. Therapeutic alternatives are not bioequivalent to their brand-name counterparts, but are alternative medicines that treat the same medical condition in a similar way.

[4] The Abilify Savings Card states that it is "not an insurance card." The front of the card instructs pharmacists on how to process the card as "secondary coverage."

[5] Plaintiffs allege that "co-pay programs work," relying on a 2011 study based on evidence from co-pay subsidy program administrators that concludes that "25% of [co-pay subsidy program] use results in a [subsidized] drug being used instead of a preferred brand or generic that might have been used in the absence of the [subsidy]."

programs all work the same way.  Individuals enroll in drug-specific programs online and

provide basic information.  The drug company then mails them a wallet-sized card that includes

instructions to pharmacists on how to process covered prescriptions.  First, the pharmacist enters

information into a computerized data management system.  Information about the patient,

including the patient's personal co-pay obligation, is transmitted to the pharmacist from the

insurance company or its pharmacy benefit manager ("PBM").  After learning what the patient

owes, the pharmacist then enters information from the co-pay card system into the secondary

insurer field.  The plan member pays the out-of-pocket difference between his or her co-pay and

the amount subsidized by Defendants.  Thus, the TPP—e.g., Plaintiffs—pays the full amount of

its usual payment for the branded drug in question, but the plan member pays only part (or none)

of his or her ordinary co-pay.  The patient's TPP is never told, and has no way of knowing, that a

third party—such as BMS—has paid all or nearly all of the personal co-pay obligation.

Defendants not only determine the price at which wholesalers or large retailers will

purchase prescription drugs from them, but also control the reimbursement benchmark used to

determine the amount to be paid for the drugs by public and private health benefit providers.

BMS sets the Wholesale Acquisition Cost ("WAC") for its drugs, and either BMS or a reporting

agency causes to be published the Average Wholesale Price Price ("AWP") for its drugs.

Plaintiffs allege that "[w]hen cost sharing is routinely waived, the true acquisition cost for the

medical service or product is not the stated or reported price being charged to health benefit

providers, but rather the price *after deduction for the routinely waived co-payment*." (emphasis in

original).

Plaintiffs allege that Defendants' co-pay subsidy programs "undermine the contractual

insurance arrangement between the insurer and the insurer's member by reducing or eliminating

the personal cost-share feature of the insurance contract" and "increase the overall burden on the

plan for providing benefits to its members."  Further, "[b]y providing undisclosed kickbacks to reduce or eliminate the cost-sharing mechanism in thousands of health insurance contracts for widely used maintenance prescription drugs, defendants unfairly undermine health benefit providers' best attempts to control prescription drug costs."  Indeed, "Defendants offer such sweeping bribes that they often effectively reduce the co-pay for their branded drug to *less* than the average co-pay for therapeutic or AB-rated generic alternatives," and, in so doing, "intend to interfere with health plans' cost-sharing provisions."  (emphasis in original)

Defendants' co-pay subsidy programs require use of the mail and wires, as Defendants advertise their co-pay subsidy programs on the Internet, in magazines, and on network television, and send the physical co-pay cards to individuals, doctors, and pharmacies via the mail.

## II.    Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) (quotations omitted).  That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citation omitted); *see also id.* ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action

5

will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." (quotation marks and citations omitted) (alteration in original)).

## III.  RICO Claims

### A.  Definition of RICO

Congress enacted RICO in 1970 as part of the Organized Crime Control Act "to seek the eradication of organized crime in the United States."  Pub.L. No. 91–452 (1970).  Pursuant to the statute, it is "unlawful for any person employed or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

To state a plausible civil claim for violation of RICO § 1962(c), Plaintiffs' pleadings "must demonstrate, as to each defendant, that while employed by or associated with an enterprise engaged in interstate or foreign commerce, and through the commission of at least two predicate acts constituting a 'pattern of racketeering,' the defendant directly or indirectly conducted or participated in the conduct of the affairs of such enterprise."  *Gross v. Waywell*, 628 F. Supp. 2d 475, 485 (S.D.N.Y. 2009) (citing 18 U.S.C. § 1962(c); *Spool v. World Child Int'l Adoption Ag.*, 520 F.3d 178, 183 (2d Cir. 2008)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) ("To establish a civil RICO claim, a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'  The pattern of racketeering activity must consist of two or more predicate acts of racketeering." (citations omitted)).

The Supreme Court has noted that "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'"  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citation omitted).  The true civil RICO plaintiff may well provide a laudatory societal service, supplementing the government's efforts "to protect the general public and the

common good from felonious conduct." *Gross*, 628 F. Supp. 2d at 481 (citing *Agency Holdg.*

*Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 151 (1987)).  Yet it is well known that the federal

courts are flooded with cases molded to the RICO form, even though they are truly little more

than garden variety claims for fraud.  *See Rosenson v. Mordowitz*, No. 11 Civ. 6145, 2012 WL

3631308, at *4 (S.D.N.Y. Aug. 23, 2012).  "Consequently, courts have an obligation to

scrutinize civil RICO claims early in the litigation [to] separate the rare complaint that actually

states a claim for civil RICO from that more obviously alleging common law fraud."  *Id.*

## B.      Pattern of Racketeering:  Mail and Wire Fraud

"To allege a violation of Section 1962(d), Plaintiff[s] must 'allege that the defendants

agreed to commit at least two predicate acts in furtherance of a pattern of racketeering activity,

and that these agreed-upon acts, if carried out, would have formed a pattern of racketeering

activity.'"  *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 141-42 (S.D.N.Y.

2010), *aff'd in part*, 431 F. App'x 17 (2d Cir. 2011), and *aff'd*, 651 F.3d 268 (2d Cir. 2011)

(quoting *Jordan* (*Bermuda) Inv. Co. v. Hunter Green Inv. Ltd.*, 154 F. Supp. 2d 682, 695

(S.D.N.Y. 2001) (citation omitted)).  The specific predicate acts that constitute racketeering

activity are enumerated in the statute and include mail fraud (18 U.S.C. § 1341) and wire fraud

(18 U.S.C. § 1343).  *See* 18 U.S.C. § 1961(1).  "A violation of mail or wire fraud requires a

showing of (1) a scheme or artifice to defraud and (2) a mailing or wire transmission in

furtherance of that scheme."  *Boritzer v. Calloway*, No. 10 Civ. 6264, 2013 WL 311013, at *6

(S.D.N.Y. Jan. 24, 2013) (citing §§ 1341, 1343).  "If a party intends to allege that

communications constitute predicate acts of mail or wire fraud, it must allege the following

elements of those offenses: (1) the existence of a scheme to defraud, (2) defendants' knowing

participation in such a scheme, and (3) the use of wire or mail communications in interstate

commerce in furtherance of that scheme."  *MLSMK Inv. Co.*, 737 F. Supp. 2d at 142 (quotation

marks and citations omitted); *see also Boritzer*, 2013 WL 311013, at *6 ("[A] proper pleading of

predicate acts based on mail and wire fraud requires an allegation of an underlying fraudulent

scheme, which, in turn, [requires] (1) the existence of a scheme to defraud; (2) fraudulent intent

on the part of the defendant; and (3) the materiality of the representations." (internal citations and

quotation marks omitted)).  RICO allegations "merit particular scrutiny where, as here, the

predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not

in and of itself illegal, unlike other predicate acts such as murder or extortion."  *Rosenson*, 2012

WL 3631308, at *4 n.3.

     RICO claims based on mail and wire fraud are subject to the heightened pleading

standard established by Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake."  *See McLaughlin*

*v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (noting that Rule 9(b)'s heightened pleading

standard applies where mail fraud is alleged as a RICO predicate offense).  "[T]o comply with

Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d

Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also*

*Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 389 (S.D.N.Y. 2009) (noting

applicability of Rule 9(b) requirements in the RICO context).  "Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."  Rule 9(b).

     Plaintiffs make the following allegations in support of their claim that Defendants have

committed mail and wire fraud:

> 124.   The co-pay subsidy enterprise engaged in an intentional
> scheme to defraud plaintiffs and the class by interfering with their
> cost-sharing provisions, causing them to pay for prescriptions of

the subsidized drug that they would not otherwise have paid for, and causing them to pay an inflated rate for each subsidized prescription.   These transactions necessarily involve use of the wires.

125.   The co-pay subsidy enterprise engaged in an intentional scheme to defraud plaintiffs and the class by causing misrepresentations to be made via the wires at the time of the point of sale transaction — that is, when the member presents the co-pay card at the pharmacy — when, as instructed by the defendants, the pharmacist electronically charges the health benefit provider the full benchmark price without accounting for the existence of co-pay subsidies (as instructed by defendants).   These transactions necessarily involve use of the wires.[6]

126.   The co-pay subsidy enterprise engaged in an intentional scheme to defraud plaintiffs and the class by reporting benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays.   These transactions necessarily involve the use of the mail and wires.[7]

Defendants argue, and Plaintiffs do not dispute, that the mere *existence* of the BMS co-pay

subsidy program is not a fraud on anyone because it involves no element of deception.   To the

contrary, the program is "open and notorious," information about its terms and conditions is

---

[6] A related allegation appears at paragraph 97 of the Complaint:

97.   Defendants and their co-conspirator administrator make misrepresentations via the wires at the time of the point of sale transaction — that is, when the member presents the co-pay card at the pharmacy — when, as instructed by the defendants, the pharmacist electronically charges the health benefit provider the full benchmark price without accounting for the existence of co-pay subsidies.   These transactions necessarily involve use of the wires.

[7] A related allegation appears at paragraph 98 of the Complaint:

98.   Defendants make additional misrepresentations via the mail and wires when defendants report benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays. These transactions necessarily involve the use of the mail and wires.

readily available on a number of public websites, and Plaintiffs do not allege that anyone is deceived about the effect of these programs.  Nor do Plaintiffs allege any sort of omission or misrepresentation with respect to the existence of the program.  *See, e.g.*, *McLaughlin*, 962 F.2d at 192 ("The mail fraud statute requires some element of deception."); *Borizer*, 2013 WL 311013, at *6 ("In order for the deceit implicit in fraud to rise to the level of wire fraud in particular, 'defendants must have used the . . . wires as a means to obtain money or property by means of false or fraudulent pretenses, representations, or promises or for purposes of executing a scheme to defraud.'" (quoting *Drexel Burnham Lambert, Inc. v. Saxony Heights Realty Assoc.*, 777 F. Supp. 228, 238 (S.D.N.Y. 1991)).  Rather, the allegations in paragraph 124 show only that Plaintiffs believe that the co-pay subsidy program is counter to their business objectives.

The main dispute over the predicate offense requirement thus turns on Plaintiffs' remaining theories of mail and wire fraud: (1) that Defendants caused misrepresentations to be made at the point of purchase ("misrepresentation theory"); (2) that Defendants committed fraud through the routine and hidden waiver of personal co-pay obligations ("waiver theory"); and (3) that Defendants committed fraud by causing inaccurate price benchmarks to be promulgated ("benchmark theory").  As discussed below, the misrepresentation and waiver theories of liability do not succeed as a matter of law and the RICO allegations based on those theories of fraud are dismissed with prejudice.  The benchmark theory has not been alleged with the requisite specificity under Rule 9 and must therefore be rejected at this point in the litigation, though Plaintiffs are granted leave to re-plead solely with respect to that theory of fraud.

### 1.     The Misrepresentation Theory

Plaintiffs allege that Defendants cause "misrepresentations to be made . . . at the time of the point of sale transaction . . . when, as instructed by the defendants, the pharmacist electronically charges the health benefit provider the full benchmark price without accounting for

the existence of co-pay subsidies (as instructed by defendants)."  Plaintiffs do not, however, allege that they have been provided with any records from either Defendants or pharmacies falsely stating that an insured paid the co-pay unaided by a co-pay subsidy coupon.  To the contrary, Plaintiffs allege that co-pay subsidy coupons are input by pharmacists *after* the principal insurance claim has been submitted and the TPP (or its PBM) informs the pharmacist of the plan member's co-pay obligation.  Further, there is no active deception in the pharmacists' point-of-sale statements to TPPs that insureds have satisfied their co-pay obligation—at least, no more so than would be the case if an insured got the money to cover the cost from his rich uncle or a stranger on the street, as opposed to his own pockets.  Thus, even by their own account, Plaintiffs have not received any records containing misrepresentations of the sort that could ground a claim for fraud.  And Plaintiffs do not identify point-of-sale misrepresentations by Defendants that purportedly caused doctors to prescribe, patients to purchase, or TPPs to reimburse for Abilify.  These pleading deficiencies fall far short of *Iqbal* and Rule 9(b).

Plaintiffs' true concern appears to be that pharmacists, allegedly at Defendants' behest, are remaining silent about the use of co-pay subsidy cards.  Thus, Plaintiffs' allegations could support a claim for fraud only if there is a duty on the part of Defendants either to disclose to TPPs information concerning use of the co-pay subsidy coupons they have issued, or to instruct the pharmacies to do so.  In other words, the Complaint alleges an omission by Defendants, not a misrepresentation, even though it does not allege the nature of or basis for this duty to disclose.[8] *See* Complaint at ¶ 76 ("In a transaction with the use of the subsidy, the information transmitted

---

[8] The only potential misrepresentation in Plaintiffs' narrative occurs when Defendants provide information to pharmacies on the co-pay subsidy cards about how to enter subsidy information, but Plaintiffs do not allege that any information contained on the co-pay cards is false and do not explain how such misrepresentations made by Defendants to pharmacies could serve as the predicate act for a RICO claim brought by Plaintiffs (a matter that implicates both the predicate act requirement and RICO's requirement of proximate causation).

to the health benefit provider *does not include any disclosure that a subsidy was paid.*" (emphasis added)); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996) *aff'd sub nom. Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc.*, 113 F.3d 1229 (2d Cir. 1997) ("An omission of a material fact can constitute fraud under RICO if either there exists a duty to disclose the information or the defendant makes statements of half-truths or affirmative misrepresentations." (quotation marks and citation omitted)).

Specifically, Plaintiffs allege either (1) the existence of a duty on Defendants' part to disclose to Plaintiffs information concerning which of Plaintiffs' insureds have used co-pay coupons issued by Defendants and the purchases on which they did so; or (2) the existence of a duty on Defendants' part to instruct pharmacies to convey such information to TPPs at the point of sale. The question is whether any such duty exists.

The Complaint does not allege the existence of any contractual relationship, or any other kind of relationship, between Defendants and any party that would require either Defendants or pharmacies to disclose to TPPs when a plan member uses a co-pay subsidy card provided by Defendants. Nor does the Complaint allege that a pharmacy has a contractual duty to collect less money from the TPP when a co-pay subsidy is used. In any event, such a duty would flow from the contractual arrangement between Plaintiffs and pharmacies, and Defendants' statements to pharmacies about what to tell Plaintiffs would not qualify as fraud on Plaintiffs.[9] Plaintiffs have alleged nothing that would allow Defendants to be held liable for a misrepresentation—or omission—made by pharmacists to Plaintiffs, as they do not claim that the pharmacists were agents, co-conspirators, or members of a RICO enterprise with Defendants. Moreover, a pharmacy's alleged failure to disclose to Plaintiffs the fact that a consumer used a co-pay subsidy

---

[9] Plaintiffs have not asserted a claim of tortious interference with the contractual arrangements in place between pharmacies and TPPs, or with those between insureds and TPPs.

coupon to pay for part of his or her co-pay cannot plausibly support a claim for fraud against

Defendants because Plaintiffs admit that their reimbursement of the pharmacy is separately

governed by contract and does not depend on any point-of-sale representation.

### 2.    The Waiver Theory

Plaintiffs argue that "[r]outine and hidden waiver of personal copay obligations is fraud."

In support of this proposition, Plaintiffs invoke several judicial decisions and federal statutes.

None of these sources supports the proposition of law advanced by Plaintiff and, even if they did,

Plaintiffs' claim would still fail because Plaintiffs have not alleged any waiver of co-pays.

Starting with the cases cited by Plaintiffs for the proposition that routine and hidden

waiver of personal co-pay obligations is fraud, none of these cases were decided by the Second

Circuit, or even by any district court within the jurisdiction of the Second Circuit.  As persuasive

authority, these decisions guide, but do not control, the Court's analysis.  More importantly, none

of these cases truly supports the proposition of law that Plaintiffs would have the Court adopt.

In *Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir. 1991), the

Seventh Circuit considered a suit by a physician against an insurance company that refused to

pay a claim upon learning that the physician had signed a contract with his patient waiving the

co-pay obligation.  The insurance company's policy provided that "[n]o payment will be made

for expenses incurred . . . (5) for charges which the Employee or Dependent is not legally

required to pay."  The insurance company argued that, by relieving his patient of any legal

requirement to cover the co-pay charges, the physician triggered this "no payment" provision.

*Id.* at 701 ("By promising that he would look exclusively to CIGNA for payment, Kennedy

relieved Myers of any legal obligation to pay.  So Kennedy's charge *to the patient* was zero, and

80% of nothing is nothing.").  The court agreed.  Noting that the employer who furnished the

patient with insurance "had every legal entitlement to create" a co-pay requirement, the court

examined the "function of the two contracts"—namely, the contract relieving the patient of her co-pay obligation and the insurance policy.  It concluded that if the physician "wishes to receive payment under a plan that requires co-payments, then he must collect those co-payments—or at least leave the patient legally responsible for them." *Id.*  This answer was "contractual" in nature: the contract between the patient and insurance company justified the rule that a "patient's rich aunt or best friend may pay the 20%," but a patient's physician could not do so. *Id.* at 702. The *Kennedy* ruling included a lengthy policy discussion in which Chief Judge Easterbrook opined on the vices of allowing patients to dodge their co-pay obligations, but the outcome of the case turned exclusively on the nature and function of the contracts at issue.

So too the Ninth Circuit's contract-based ruling in *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780 (9th Cir. 1996).  In that case, SmileCare offered a supplemental insurance plan to cover co-pay obligations.  *Id.* at 781.  Delta Dental refused to recognize co-pays made by supplemental insurers as contractually valid and deemed participating dentists who accepted such payments to be in breach of their contract with Delta Dental, which prohibited waiver of co-pays.  *Id.* at 781-82.  SmileCare alleged that Delta Dental thereby violated § 2 of the Sherman Act.  *Id.* at 782.  Noting that "the legality of co-payment plans and waiver prohibition clauses is neither at issue nor seriously in question," the court set aside the parties' policy arguments and focused on the supposed "impermissible anticompetitive effects" of Delta Dental's "refusal to recognize as contractually valid a participating dentist's acceptance of co-payment from a supplemental insurer rather than from the patient herself." *Id.* at 783-84.  Addressing the merits of SmileCare's Sherman Act claim, the Ninth Circuit affirmed the district court's ruling dismissing the case under Rule 12(b)(6).[10]

---

[10] The Ninth Circuit relied in part on analogy to *Kennedy*:  "The same reasoning applies here. Delta Dental concedes that if SmileCare paid the *patient* the co-payment, and the patient then

Plaintiffs also rely on the inapposite case of *Feiler v. New Jersey Dental Ass'n*, 191 N.J. Super. 426, 467 A.2d 276 (Ch. Div. 1983), *aff'd*, 199 N.J. Super. 363, 489 A.2d 1161 (App. Div. 1984).  In *Feiler*, the Superior Court of New Jersey found deception on the part of a dentist who violated the terms of his contract with dental insurers by making "false representations of the amount of his fees when billing carriers and other third-party payers."  *Id.* at 283.  Specifically, despite contract rules requiring that he report his "actual charges" and "usual, customary and reasonable fees," the dentist concocted a scheme whereby he overstated his costs to the insurer, the insurer paid a portion of that cost, and then he waived patients' co-pay obligations.  The court held that if the amount of the routinely waived co-pay is included in the doctor's stated fee, then the stated fee is false:

> The fact is that, even on his own explanation, Feiler's usual and customary fees apply only to those few cases in which payment plans are disappointed.  Those fees are therefore not usual and not customary.  And they do not represent actual charges to patients. Feiler's statements to a third-party payer whose agreement includes a copayment feature appear to be untrue on their face.  A dentist's statement that asserts he charges $100 for a procedure is untrue if he intends to forgive copayment upon receipt of $80 and if he almost always receives such part payment.  Such a dentist's statement enables its author to achieve an advantage over other dentists by relieving the patient of the burden of his copayment.

*Id.* at 282.  The court noted that "[d]ental insurers are entitled to write policies containing copayment provisions . . . [i]t is not up to dentists to tiptoe around [them] by overbilling."  *Id.* at 284.[11]

---

paid the dentist, it would have no objection or cause to find its providers in breach of contract. This would mirror the scenario with the rich aunt.  However, because SmileCare pays the *dentist,* the legal obligation required of the insured is eliminated, distorting the actuarial basis for Delta Dental's co-payment plan."  *SmileCare*, 88 F.3d at 784 (footnote omitted).

[11] Plaintiffs cite *Tom v. Hawaii Dental Serv.*, 606 F. Supp. 584 (D. Haw. 1985), to bolster their point.  Yet it offers nothing more than does *Feiler*.  In *Tom*, as in *Feiler*, the fact pattern involved a dentist who, in violation of an insurer's policy, profited by misstating his actual fees to insurers

As applied here, *SmileCare* and *Kennedy* stand only for the proposition that health insurers may create contracts that relieve them of the duty to pay physicians and dentists who routinely waive co-pays.  Although these opinions offer policy arguments in favor of a preference for rules that secure co-pay schemes against efforts to side-step them, their analysis rests ultimately on the foundation of contract.  They do not create any sort of general rule that routine and hidden waiver of co-pays, even in the absence of a contractual obligation to enforce the co-pay requirement, states a claim for fraud.[12]

---

and then waiving patients' co-pay obligations.  The dentist had filed suit against the insurers in federal court, alleging that they engaged in price-fixing and monopoly.  Focusing on the dentist's standing to raise this argument, Judge Pence of the District of Hawaii rejected the argument that he had standing to assert an injury by virtue of the insurers' refusal to allow him to waive the patients' required co-pay.  Quoting from *Feiler*, *Tom* observed that "it has been held that waiver of copayments is a fraudulent and deceptive business practice and is actionable by any dentist." *Id.* at 586.  Thus, *Tom* stands only for the same proposition as *Feiler*: it is fraudulent for dentists to engage in a scheme to systematically overcharge insurance companies in violation of their contractual obligations, while at the same time routinely and secretly waiving patients' co-pay requirements.  The Court takes no position on whether these cases—one decided by a New Jersey state trial court in 1983, the other by a district court in another jurisdiction in 1985— accurately state the law applicable to this case.  It suffices to observe that neither of these cases supports the legal rule advanced by Plaintiffs.

[12] Plaintiff's other case citations are equally unavailing.  *Reynolds v. California Dental Serv.*, 200 Cal. App. 3d 590, 593 (Ct. App. 1988), dealt with allegations of illegal price fixing under sections 16720 and 16750 of the Cartwright Act.  *Id.*  That state court saw no violation where a dental insurance company's provider contract included two disputed provisions: one requiring providers to make "reasonable efforts to collect from an eligible patient the entire amount" of any co-pay, and the other stating that the insurer would not pay a dentist for a service more than he or she actually charged or usually charged for that service.  *Id.* at 594-96.  *Reynolds*, like several other cases cited by Plaintiffs, dealt only with contractual agreements and only with the alleged anti-competitive effects of certain agreements pertaining to non-waiver rules.

Plaintiffs also rely on *OSF Healthcare Sys. v. Banno*, No. 08-1096, ECF No. 61 (C.D. Ill. March 30, 2009).  In that case, the court initially concluded that "[t]he Complaint fails to sufficiently allege that Peoria Day owed a legal duty to Caterpillar," and that it failed "to specifically allege how or why Defendants had a legal duty to Caterpillar to charge and/or collect co-payments from Caterpillar members." *OSF Healthcare Sys. v. Banno*, 08-1096, 2008 WL 5170628, at *3 (C.D. Ill. Dec. 10, 2008).  Plaintiff then filed an amended complaint, in which it alleged as follows:

By the same token, none of the statutes cited by Plaintiffs supports their claim.  Two of

these statutes, 42 U.S.C. §§ 1320a-7a and 1320a-7b(b), are federal anti-kickback laws that apply

only to federal health care programs.  There is no allegation in the Complaint that Defendants

have violated these laws or that Plaintiffs administer federal health care programs.[13]  Plaintiffs

also rely on the False Claims Act, 31 U.S.C. § 3729, which uses "claims" as a term of art as

defined at § 3729(b)(2) and in a manner that does not encompass any of the "claims" at issue in

this case.  Turning to 18 U.S.C. § 1347, the federal health care fraud statute, Plaintiffs do not

---

> Caterpillar's co-insurance payment obligations imposed on
> Caterpillar Members were created by Caterpillar's various health
> benefit plans offered to the Members . . . .  Caterpillar Members
> were responsible for paying the balance of the charges (co-
> insurance).  Benefits for covered services were either paid to the
> Member or, far more often, assigned by the Members to the health
> care providers, such as PDSC, which would then bill their charges
> directly to Caterpillar.  By agreeing with the Member to accept an
> assignment of benefits, PDSC would receive direct payment from
> Caterpillar, as provided by the Caterpillar health benefit plans, and
> agreed that it was entitled, pursuant to the terms of those health
> benefit plans, to no more benefits than was the Caterpillar Member
> under the benefit plans
>
> The benefit plans provided that Caterpillar would compute its
> payment of benefits to the member or his/her assignee based only
> on the charged fees the Member was legally required to pay.  By
> accepting an assignment of benefits under the Caterpillar benefit
> plans, PDSC was obligated to bill and attempt to collect the co-
> insurance from the Member.

First Am. Compl. ¶¶ 14-15, *OSF Healthcare Sys. v. Banno*, No. 08-1096, ECF No. 48 (C.D. Ill.
Jan 16, 2009).  This Complaint then survived a motion to dismiss.  Thus, *OSF* is yet another case
in which allegations pertaining to a duty to enforce co-pay requirements flowed from a
contractual arrangement between private parties, not any sort of free-standing legal rule based in
tort or criminal law that would have rendered it fraudulent for the provider to routinely waive
and conceal the waiver of co-pays.

[13] In the Complaint, Plaintiffs include an image of the Abilify co-pay card, which states that "if
your health insurance is covered by any state or federally funded programs such as Medicare or
Medicaid . . . you may not be eligible for the ABILIFY Savings Card."

allege in the Complaint that this statute is part of the pattern of racketeering activity.  Further, no

case decided under § 1347 has concluded that use of co-pay subsidy cards—or the routine waiver

of co-pay obligations in the context of private insurers—states a claim for health care fraud, and

Plaintiffs cite no cases or additional authority in support of that interpretation.[14]

　　　　But even if Plaintiffs' brief did accurately state the law, there is no waiver of the co-pay

by Defendants when insureds fill prescriptions for Abilify.  To the extent that pharmacies are

fairly characterized as 'providers,' and to the extent that this practice is fairly characterized as a

'waiver' of the co-pay, it is pharmacies—not Defendants—that offer the waiver.  Plaintiffs

identify no basis for treating as fraudulent *the provision* of a subsidy that allows pharmacies to

'waive' a fee.  Of course, this is all speculative, since there is not *actually* any waiver.

Pharmacies collect the full amount of the co-pay obligation every time, either from the patient or

BMS.  Failure to do so would force the pharmacy to bear that cost.  And unlike the parties in

*Smilecare*, Plaintiffs do not allege that any contracts between Plaintiffs and the pharmacies

forbid pharmacies from accepting co-pay assistance payments from BMS as the form of payment

---

[14] Plaintiffs cite a Colorado statute that does not alter the Court's analysis.  This law provides
that "if the effect is to eliminate the need for payment by the patient of any required deductible or
copayment applicable in the patient's health benefit plan, a person who provides health care
commits abuse of health insurance if the person knowingly: (a) Accepts from any third-party
payor, as payment in full for services rendered, the amount the third-party payor covers; or (b)
Submits a fee to a third-party payor which is higher than the fee he has agreed to accept from the
insured patient with the understanding of waiving the required deductible or copayment."  Colo.
Rev. Stat. Ann. § 18-13-119 (West).  This statute does not prohibit co-pay subsidies by
manufacturers; rather, it prohibits health care providers from waiving co-pays.

　　　　In the Complaint, Plaintiffs also refer to a Massachusetts law that bans co-pay coupons
for private payers; since the Complaint was filed, Massachusetts has amended this statute to
permit co-pay subsidies for drugs, like Abilify, that lack an AB-rated generic equivalent as
determined by the FDA.  *See* 2012 Mass. Legis. Serv. Ch. 139 (H.B. 4200) (West) (codified at
Mass. Gen. Laws. Ch. 175H § 3(b)).

for satisfaction of co-pay duties.  Nor do Plaintiffs allege the existence of any contract between Plaintiffs and BMS that prohibits BMS from providing subsidies or that disqualifies such subsidies as a valid form of co-pay.

Defendants cannot "waive" a co-pay subsidy because that subsidy is not owed to them, and they do not commit fraud by enabling pharmacies to "waive" co-pays—embracing that characterization *arguendo*—because there is no deception, misrepresentation, or omission involved when they do so.  Absent contractual prohibitions on that conduct, of a sort described in the cases recited by Plaintiffs, Defendants have not violated the laws identified by Plaintiffs.

### 3.  The Benchmark Theory

The final alleged predicate act theory is that Defendants "engaged in an intentional scheme to defraud plaintiffs and the class by reporting benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays."  The Complaint includes two principal paragraphs elaborating on the factual allegations underlying this theory of mail and wire fraud:

> 57.  Drug companies, including defendants, not only determine the price at which wholesalers or large retailers will purchase prescription drugs from them, but also control the reimbursement benchmark used to determine the amount to be paid for the drugs by public and private health benefit providers.  Either by directly determining the so-called average wholesale price (or "AWP") or by determining a related price benchmark known as the wholesale acquisition price (or "WAC") that reporting agencies use to mathematically determine the AWP, branded drug manufacturers cause to be published the widely-used and nearly ubiquitous benchmark prices for payments and reimbursements that health benefit providers make to pharmacies for branded, retail-channel drug products.

> 58.  Branded drug manufacturers, including defendants, know that the reported benchmark that they control is required to be a reasonably fair estimation of the actual price for the ingredient cost of the drug to the retailer.  When a prescription for a privately-insured individual is filled at the retail level (*i.e.*, a pharmacy), the

pharmacy charges the member's plan for the ingredient cost of the drug plus a dispensing fee.  The amount to be charged for the ingredient cost is based on a percentage discount from the benchmark (*e.g.*, AWP minus 14% for all branded drugs).  Thus, the stated benchmark represents the price that all participants—the health benefit provider, its pharmacy benefit manager, the pharmacy and the manufacturer—understand is a reasonable estimate of the actual cost to the pharmacy on which the payer's reimbursement to the pharmacy is based.  Of course, if a cost-sharing provision exists for the member's prescription drug plan, then the cost share (*e.g.*, co-payment or co-insurance) is deducted from the amount owed by the plan to the pharmacy and is imposed on the member as a payment to the pharmacy.  However, for subsidized co-pays, the true benchmark is less, resulting in an inflated payment by the health insurers.

The fraud allegation is then spelled out later in the Complaint:

> 126.  The co-pay subsidy enterprise engaged in an intentional scheme to defraud plaintiffs and the class by reporting benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays.  These transactions necessarily involve the use of the mail and wires.

In their filings and at oral argument, the parties have relied heavily upon materials that are inappropriate for consideration in a motion to dismiss, including findings of fact in other cases and unsworn assertions of counsel about facts in the world.[15]  At this stage, the Court focuses

---

[15] For example, Plaintiffs state in their brief that "AWPs must have a reasonable and fair relationship to the actual price charged by the manufacturer," citing a case that, in construing the term "AWP" in the federal Medicare statute as a matter of law, described what some people in the pharmaceutical and regulatory fields thought about AWP price benchmarks at a particular moment in time.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 284 (D. Mass. 2006).  Similarly, Defendants argue that AWP is defined based on a mathematical mark-up over WAC, citing for this proposition part of the "Findings of Fact" in another case.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 33 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009).  The parties rely on many other statements from the *AWP* litigation that do not count as part of the record in this case.  Thus, to cite one of many possible examples from the briefing in this case, Plaintiffs look to the *AWP* Court's conclusion that gross inflation of AWPs is an unfair and deceptive business practice, even though that court reached this finding after noting that "[t]he key question in this litigation is whether causing the publication of an AWP that greatly exceeds the average sales price charged to a doctor or pharmacist for certain drugs *covered by Medicare Part B* is an unfair or deceptive trade practice under Chapter 93A."  *Id.* at 94 (emphasis added).  Simply put, the *AWP* Court's conclusions of

solely on the Complaint, questions of law, and materials of which it may properly take judicial notice.

As noted *supra*, Rule 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud or mistake." *McLaughlin*, 962 F.2d at 191. "[T]o comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d at 290 (quoting *Mills*, 12 F.3d at 1175). Plaintiffs have not satisfied these requirements of Rule 9(b). Indeed, by virtue of the lack of specificity of their pleadings, Plaintiffs cannot survive even the comparatively more forgiving plausibility threshold imposed by *Iqbal* and *Twombly*.

One critical difficulty is that the Complaint offers virtually no specifics concerning WAC and AWP. In Paragraph 57, the Complaint alleges in general terms that drug companies control two things: (1) the price at which wholesalers or large retailers buy prescription drugs from them, and (2) the reimbursement benchmark used to determine the amount to be paid for the drugs by public and private health benefit providers. The Complaint then states that either by directly determining AWP or WAC figures, branded drug manufacturers "cause to be published" certain "widely-used and nearly ubiquitous" benchmark prices for payments and reimbursements; the unarticulated implication is that AWP and WAC *are* these benchmark prices, though it is not perfectly clear from the Complaint if these are the only benchmarks or are the benchmarks on

---

law bear almost exclusively on issues that are not relevant here, while the portions of its opinion relied upon by the parties and described in their filings as "holdings" actually qualify as findings of fact or as mixed questions of law and fact. The doctrine of issue preclusion is not applicable here and there is no basis for taking judicial notice in this case of the truth of facts found on the basis of a record compiled in the *AWP* litigation. Further, counsel to both parties offered detailed testimony at oral argument, including statements about industry expectations and norms, Defendants' business practices regarding WAC and AWP, and their prior litigation experience. These in-court statements by counsel do not bear on the analysis undertaken here.

which TPPs and other market participants allegedly rely.  In any event, the Complaint does not

actually define either WAC or AWP, except to the decidedly limited extent that these terms are

presumed to be self-defining or can be attributed to other benchmarks sketched in the Complaint.

Moreover, the Complaint does not define the relationship between AWP and WAC, noting only

that "reporting agencies" mathematically determine the AWP based on the WAC through some

unspecified formula or, potentially, formulae—though sometimes, it seems, manufacturers can

directly determine the AWP.  Nor does the Complaint clarify what relationship, if any, exists

between the definition of these terms as used in the private market and the definition of these

terms as codified in certain statutes relating to federal health care programs.  *See* 42 U.S.C. §

1395w-3a(c)(6)(B).  Finally, Plaintiffs do not allege when, where, or how WAC and AWP values

are published, do not allege who publishes them, and do not specifically identify and describe

any WAC or AWP values that have actually been published and that are allegedly fraudulent.

Turning to Paragraph 58, the Complaint alleges that "the reported benchmark that [the

drug manufacturers] control is required to be a reasonably fair estimation of the actual price for

the ingredient cost of the drug to the retailer."  This paragraph is non-specific as to whether "the

reported benchmark" at issue in the WAC, the AWP, or perhaps some other "benchmark prices"

that manufacturers "cause to be published."  Critically, it is also vague regarding one of the main

issues in the case: whether the industry understanding looks to the "net" or "true" price paid by

the retailer to the manufacturer in the course of all transactions between them relating to each

sale of a drug, or whether the "actual price for the ingredient cost" is understood only as the sale

price when the manufacturer actually sells the drug to the retailer (without regard to any future

rebates or discounts).  The final line of Paragraph 58 refers to the "true benchmark," but the part

of the paragraph alleging industry understanding of the meaning of the benchmark does not refer

in a specific fashion to the nature of this understanding.  Rather, the first and fourth sentences speak only of the "actual price"—a vague term at the heart of Plaintiffs' theory of fraud.[16]

Because the benchmark theory pivots on vague and general pleadings, it is impossible from an examination of the Complaint to ascertain and evaluate Plaintiffs' theories of fraud and causation.  Without detail about who engaged in deception, when and where they did so, why the statements at issue were actually deceptive, and how others (including TPPs) responded to that deception, the Court cannot determine whether the Complaint states a claim upon which relief could be granted.  In light of the voluminous material presented at oral argument and in the briefing, however, it appears as though Plaintiffs may potentially be able to amend their pleadings to add the requisite particularity.  Accordingly, solely as to the benchmark theory of fraud, Defendants' motion to dismiss is granted without prejudice and Plaintiffs will be granted leave to file an amended complaint within 60 days of the issuance of this opinion.

## IV.   Commercial Bribery

Count III of the Complaint alleges commercial bribery in violation of the Robinson-Patman Act, 15 U.S.C. § 13(c) ("RPA").  In Plaintiffs' view, "Section 2(c) of the [RPA]

---

[16] Paragraph 58 is confusing for other reasons.  For example, it alleges that when pharmacy retailers buy a drug from a manufacturer, they pay a reported benchmark price that is "required to be a reasonably fair estimate of the actual price for the ingredient cost of the drug to the retailer."  It then alleges that when pharmacies sell that drug, they charge the ingredient cost plus a dispensing fee, and "[t]he amount to be charged for the ingredient cost is based on a percentage discount from the benchmark (*e.g.*, AWP minus 14% for all branded drugs)."  As a matter of common sense, if the reported benchmark is "required" to represent the "actual price" to the pharmacy of buying the drug from the manufacturer, it seems surprising that pharmacies regularly charge a percentage discount *less* than that reported benchmark value when selling the drug, unless the standard dispensing fee is sufficient to compensate for the loss and create a profit.  Plaintiffs' failure to clarify the precise relationship between WAC and AWP becomes significant in this regard, as Plaintiffs do not specify which benchmark—WAC, AWP, both, or some other—is subject to these industry expectations and is being relied upon in these transactions. In the same vein, Paragraph 58's general allegation that TPPs' "reimbursement to the pharmacy is based" on benchmark prices is far too vague to satisfy RICO's proximate causation requirement.

prohibits the payment by drug manufacturers to, or on behalf of, individual insureds to eliminate or reduce their personal obligations under their prescription drug plans' cost-sharing plans."

Section 2(c) of the Clayton Act, as amended by the RPA, states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

As the Second Circuit has observed, "the statute appears to parse out as follows":

> It is unlawful for any person to
>
> > (1) pay (or receive)-
> >
> > > a. anything of value as a commission, brokerage, or other compensation, *or*
> > >
> > > b. any allowance or discount in lieu of brokerage,
> > >
> > > *except* for services rendered in connection with a sale or purchase of goods,
> >
> > (2) when the payment is made to (or by)
> >
> > > a. the other party to the transaction, or
> > >
> > > b. an agent, representative or other intermediary where the intermediary is
> > >
> > > > (i) acting for or in behalf of, or
> > > >
> > > > (ii) subject to the direct or indirect control of
> > > >
> > > > any party to the transaction other than the person by whom the compensation is paid.

24

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 218 (2d Cir. 2004); *see id.* ("'[P]recision of expression is not an outstanding characteristic of the [RPA]'" (quoting *Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 65 (1953)).[17]

This statutory provision arose in a particular context:

> Section 2, "when originally enacted as part of the Clayton Act in 1914, was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers." Augmenting that provision in 1936 with the Robinson–Patman Act, Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand.

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006) (citations omitted); *see also Dayton Superior Corp. v. Marjam Supply Co., Inc.*, No. 07 Civ. 5215, 2011 WL 710450, at *5 (E.D.N.Y. Feb. 22, 2011) ("The Robinson–Patman Act 'was specifically enacted to protect small businesses from discriminatory pricing by manufacturers in favor of large chain stores.'" (quoting *The Intimate Bookshop, Inc. v. Barnes & Nobles, Inc.*, No. 98 Civ. 5564, 2003 WL 22251312, at *2 (S.D.N.Y. Sept. 30, 2003)); *Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F. Supp. 2d 126, 130 (E.D.N.Y. 1999) ("Section 2(c) was enacted primarily to prevent large buyers from obtaining indirect price discrimination by demanding that the

---

[17] Judge Karas quotes a practitioner's observation that "[l]inguistically, Section 2(c) is a genuine piece of art. It has 115 words, all in one sentence. There are no semicolons, no clauses, just a few commas—and there has even been a debate about whether the commas are in the right places. As you might expect in such a situation, no one has ever come forward to take full responsibility for its drafting." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 522 (S.D.N.Y. 2006) *aff'd*, 328 F. App'x 695 (2d Cir. 2009) (quoting Mark L. Yeager, *Developments—1984: Living with the Robinson–Patman Act*, 53 Antitrust L.J. 1029 (1985)).

suppliers pay fees to bogus brokers, which fees would then be returned to the buyers.").  As the

Second Circuit has noted:

> Courts and commentators are in agreement that § 2(c) was enacted primarily to target the practice of "dummy brokerages" whereby large retail buying groups—such as large grocery store chains, which, unlike smaller stores, did not need to use intermediary brokers to purchase their merchandise—would require suppliers to pay fees to "dummy brokers," who then passed the fees on to the large retailer, effectively reducing the price the retailer paid for the goods.

*Blue Tree*, 369 F.3d at 221; *see also Bridges v. MacLean-Stevens Studios, Inc.*, 201 F.3d 6, 10

(1st Cir. 2000) (discussing the legislative history and purpose of §2(c)).  Thus, "[t]he *sine qua*

*non* of a § 2(c) violation . . . is an improper payment, *i.e.,* a payment of a commission, brokerage,

or discount other than for services actually rendered."  *Blue Tree*, 369 F.3d at 223.

Nonetheless, "while motivated principally to eliminate the use of dummy brokers,

Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in

existence but all other means by which brokerage could be used to effect price discrimination."

*World Wrestling*, 425 F. Supp. 2d at 502 (internal citations omitted); *see also Blue Tree*, 369

F.3d at 221 ("Some courts, applying § 2(c) to circumstances far removed from the paradigmatic

'dummy brokerage' scheme, have held that § 2(c) also proscribes commercial bribery.").  "The

Second Circuit has never reached the question of whether-and under what circumstances-

commercial bribery can form the basis of a claim under § 2(c)."  *Id.*  "While district courts within

the [Second] Circuit appear split on the issue, the majority of courts addressing the issue have

held—or have at least assumed *arguendo*—that Section 2(c) *does* encompass claims of

commercial bribery."  *Dayton*, 2011 WL 710450, at *13 (emphasis added).

The essence of commercial bribery is the corruption of the duty that an agent owes his

principal.  As one treatise explains, "[c]ommercial bribery within the reach of Section 2(c) takes

26

place when a person who purports to be an agent or fiduciary for one party to a transaction receives, for his own account and contrary to the interests of his principal, commissions or payments from the other party to the transaction."  3-26 Earl W. Kinter, *Federal Antitrust Law* § 26.12; *see also id.* at § 26.1 ("The central concept of Section 2(c) is the prohibition of so-called 'false' and/or 'dummy' brokerage.  The essence of this prohibition is that neither party to a sales transaction, nor his agent or broker, may either directly or indirectly pay to or receive from the other party any commission or allowance in lieu thereof."); 2 *Callmann on Unfair Comp., Tr. & Mono.* § 12:1 (4th ed. 2007) ("Commercial bribery may be defined as the offer of consideration to another's employee or agent in the expectation that the offeree will, without fully informing his principal, be sufficiently influenced by the offer to favor the offeror.").  Areeda and Hovencamp explain that "a violation  requires the breach of trust that is characteristic of bribery," adding that "before the statute is invoked, the payment must have crossed the 'seller-buyer line.'"  Areeda & Hovencamp, XIV *Antitrust Law* ¶ 2362 (3d ed. 2012).

Accordingly, when courts have construed § 2(c) to reach commercial bribery, they have often emphasized the need for a showing of a breach of fiduciary duty.  *See, e.g.*, *Dayton*, 2011 WL 710450, at *15 (Dayton also asserts that, to the extent courts within the Circuit have recognized Section 2(c) claims based upon allegations of commercial bribery, those cases have involv[ed] a breach of fiduciary duty by the buyer's agent.  Dayton is correct in this regard." (quotation marks and citations omitted)); *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 397 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co., Inc. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ("To the extent that section 2(c) prohibits bribery, it prohibits cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent . . .  The allegation that a discount or payment passed from one business to another does not implicate bribery involving a breach of fiduciary duty." (quotation

marks and citations omitted)); *Philip Morris*, 67 F. Supp. 2d at 130-31 (noting that § 2(c) has been construed "to cover cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent, a situation akin to the one at bar" (quotation marks and citations omitted)); *Roosevelt Sav. Bank v. Eveready Maint. Supply Co.*, No. 85 Civ. 245, 1987 WL 30194, at *1 (E.D.N.Y. Dec. 2, 1987) ("Courts construing § 2(c) . . . have deemed its language sufficiently flexible to cover cases of commercial bribery involving a breach of fiduciary duty by the buyer's agent."); *accord 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738 n.4 (3d Cir. 2004) ("As a general principle, a critical element of commercial bribery is the breach of the duty of fidelity."); *Harris v. Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272, 1274 n.3 (9th Cir. 1991) ("Section 2(c) was originally enacted to prohibit price discrimination through rebates described as brokerage.  Section 2(c), however, now has a broader purpose and can be read to prohibit commercial bribery where a fiduciary relationship exists."); *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 993 (4th Cir. 1990) ("[C]ircuit court cases finding commercial bribery in violation of section 2(c) all involve the corruption of an agency or employment relationship.").

In this vein, New York law provides that "a person is guilty of commercial bribing . . . when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs . . . ."  N.Y. Penal Law § 180.03.  And the Senate Report discussing § 2(c) emphasizes that "[t]he relation of the broker to his client is a fiduciary one.  To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship."  S. Rep. No. 1502, at 7 (1936).

To the extent that a fiduciary relationship—or some other duty of fidelity—is required to sustain a claim of commercial bribery, Plaintiffs' claim must be dismissed.  "A fiduciary

relationship exists when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."  *Ciccone v. Hersh*, 530 F. Supp. 2d 574, 577 (S.D.N.Y. 2008) (citation omitted).  Plaintiffs do not allege the existence of any such duty as a matter of law or contract, and there is no reason, on the basis of the facts alleged here, to conclude that patients owe the pertinent sorts of fiduciary duties to their insurance companies in selecting medications or obtaining money to cover their co-pay obligations.[18]  It would be hard to comprehend the scope of any such fiduciary duty—*e.g.*, must patients pressure physicians to choose generics, or act faithfully to the insurer in deciding where and how to obtain the money necessary for co-pay obligations?—and neither precedent nor logic supports the existence of the obligations that Plaintiffs would impose on their insureds.  Thus, to the extent that Defendants are alleged to violate the RPA by "bribing" insureds to select their drugs over alternative options, this claim cannot succeed on the theory that insureds qualify as fiduciaries of Plaintiffs.

 Plaintiffs, however, apparently do not rely on a fiduciary theory.  Rather, they allege that "each defendant is a 'person' making payment of something of value" because they "pay individual insureds to choose a subsidized drug that is paid for by the individual's health benefit providers."  In their view, insureds qualify as agents, representatives, or intermediaries because, "pursuant to the terms of their agreements with their health benefit providers," they both "act on

---

[18] This point is illustrated by New York law.  As Judge McKenna has observed:

> Generally, [u]nder New York law the relationship between an insurance company and a policyholder is a contractual relationship, not a fiduciary one.  Certainly under the right circumstances, the relationship between insurer and insured may be imbued with elements of trust and confidence which render the relationship more than a mere arm's-length association.  However, such special circumstances "are the exception rather than the rule."

*Schandler v. New York Life Ins. Co.*, No. 9 Civ. 10463, 2011 WL 1642574, at *12 (S.D.N.Y. Apr. 26, 2011) (citation omitted).  In other words, to the extent that such duties ever exist, courts will not lightly infer the existence of fiduciary duties on the part of an insured to a healthcare insurer, as these relationships are usually defined by contract.

behalf of their health benefit providers in having substantial control in the choice of which medication will be paid for by the health benefit providers" and "under the terms of the agreements with their health benefit providers, act subject to their health benefit providers' direct and indirect control in seeking payment for the selected medications through the terms of their plans."

Plaintiffs base this argument on commercial bribery cases that emphasize illegal payments that cross the buyer-seller line. *See Bridges*, 201 F.3d at 11 ("Where a transaction involves a seller, buyer, and a third party, the seller-buyer line is crossed if the seller or buyer pays a commission to a third party acting as the agent or intermediary of the opposing party."). In their view, Plaintiffs have been "compelled" by their insureds—acting as Plaintiffs' agents or intermediaries—to purchase drugs from BMS as a direct result of choices their insureds made while accepting payments from BMS.  Even assuming *arguendo* that Plaintiffs' buyer-seller theory of commercial bribery rests on a correct statement of the law as it would be articulated by the Second Circuit, their claim must still be dismissed for two distinct reasons.

First, Plaintiffs' argument that insureds act as their agents or intermediaries is unavailing. Plaintiffs rely on "the terms of [the insureds'] agreements with their health benefit providers," but do not quote or reference any provision of those agreements that creates any duty on the part of insureds to act "for or in behalf of" the insurer in obtaining, filling, and financing prescriptions.  Nor do they point to any provision that indicates that insureds act as agents or as intermediaries of insurers in choosing which medication to be prescribed or which prescriptions to fill.  Even to the extent that patients play a role in selecting which medications their physician will prescribe, the Complaint lacks plausible allegations demonstrating that patients act "for or in behalf of the insurer"—rather than "for or in behalf of" their personal welfare—in making such

choices.  The bare fact that insureds' decisions may entail financial consequences for the insurers does not transform insureds into intermediaries or agents.

By the same token, Plaintiffs fail to allege the requisite form of control.  They base their argument solely on certain, unspecified "terms of the agreements with [insureds'] health benefit providers" that compel insureds to act "subject to their health benefit providers' direct and indirect control in seeking payment for the selected medications through the terms of their plans."  Thus, to the extent that the Complaint alleges control by insurers over insureds, it does so by alleging that insureds are subject to the co-pay scheme and the associated incentive structure promulgated by insurers when they choose to act through their insurer.  That is the extent of the insurers' control.  Their control does not reach beyond this framework to direct or indirect control over the selection by insureds of which medication to prefer or how to finance their required co-pay.  And it does not extend to control over whether insureds choose to rely on insurance, as opposed to leaving the prescription unfilled or paying for it out of pocket.  In sum, it does not amount to a principal-agent relationship with respect to decisions about which drugs to obtain.  Thus, insurers lack the requisite type of transaction-specific control over insureds to create an intermediary or agency relationship for purposes of commercial bribery doctrine.  *Cf. Bridges*, 201 F.3d at 13 (concluding that control analysis must refer to specific transactions).

Plaintiffs' second and more fundamental problem flows from their faulty description of the "buyer" side of the buyer-seller diagram.  In other commercial bribery cases, there has been a clearly defined buyer.  In *Bridges*, for example, parents acted as buyers when they purchased photos from a photography studio (the seller) in a transaction mediated by their school district (the intermediary), which had accepted a commission from the studio that resulted in increased prices to the parents.  201 F.3d at 12.  In a Ninth Circuit case, *Harris v. Duty Free Shoppers Ltd. P'ship*, the owner of a duty free shop sued his competitor (the seller) for paying commissions to

tour companies (the intermediary) to promote the competitor's store to tourists (the buyers).  *See* 940 F.2d 1272, 1274-75 (9th Cir. 1991) (concluding that the absence of a fiduciary duty between tour guides and tourists prevents a successful commercial bribery claim).

Here, Plaintiffs style insurers as "buyers" and insureds as the insurers' "agents" or "intermediaries."  Even looking to their own Complaint, which does not include any allegation that the insurer "buys" or is the "buyer" of drugs, the reality is quite different.[19]  The Oxford English Dictionary defines a "buyer" as "one who buys, a purchaser."  It defines "buy" as "[t]o *get possession* of by giving an equivalent, usually in money" and "*to obtain* by paying a price."  *Oxford English Dictionary* (2d ed. 1989) (emphasis added).  Thus, in ordinary usage, there is an unmistakable acquisitional element to "buying" something.  When an insured walks into a pharmacy and purchases a drug, that insured is given possession of the drug and is expected to be its end user.  The drug has been prescribed to her, not to her insurer, and she is expected to consume it.  To be sure, the insured has entered into a contract with the insurer to help finance the purchase of the drug and this contract may include a tiered incentive scheme designed to encourage the insured to prefer certain drugs, but this does not mean that the insurer is the *buyer* and the insured is the *intermediary*.  For that to be the case, the insurer would have to actually buy the drug and then turn it over to its intermediary, the insured.  As a description of reality, and as an account of the factual allegations in the Complaint, this simply misses the mark.  When an insured picks up a prescription at the pharmacy, that insured buys the drug and does so subject to

---

[19] Plaintiffs do allege at ¶ 153 that "[D]efendants' co-pay subsidy program results in injury to DC 37, Sergeants, and the class because the payments *result in more purchases of the subsidized drug by plaintiffs* and the class than would have been made absent the illegal inducements." (emphasis added).  For the reasons explained *infra*, this characterization of Plaintiffs as purchasers is inconsistent with the market as described generally in the Complaint.  In any event, because Plaintiffs' status for purposes of commercial bribery doctrine is a mixed question of fact and law, the conclusory assertion that Plaintiffs qualify as buyers for purposes of the RPA does not suffice even at this pleading stage.  *See Iqbal*, 556 U.S. at 678.

a financing scheme for which he privately contracted with the insurer (either directly or through an employment relationship).[20]  Thus, the insured is the buyer and the insurer is perpendicular to—rather than an intermediary in—the transaction.

More generally, this analysis implicates the awkwardness of Plaintiffs' efforts at fitting these factual allegations into the garb of commercial bribery.  The relationship between insurer and insured is of a different sort than the principal-agent relationship presupposed by commercial bribery doctrine.  *See Stephen Jay*, 903 F.2d at 993 ("[C]ircuit court cases finding commercial bribery in violation of section 2(c) all involve the corruption of an agency or employment relationship."); *see also id.* (acknowledging that "schools and the students enjoy a special relationship of trust," but concluding that "it is abundantly clear that the schools did not assume a position resembling that of a portrait purchasing agent for the students").  While Plaintiffs might prefer to view insureds as their agents, obliged by the terms of their presumed self-interest to further the incentive schemes and financial plans of insurers, in many respects this description is upside down.  People generally contract for insurance so that they can order their financial arrangements for healthcare and avoid the perils of self-insurance.  The contracts into which they enter with private insurers denote their obligations in a relationship designed to help consumers of medical services finance their participation in that market.  As part of this arrangement, insurers typically include contract terms designed to shape the behavior of their plan members.  While insureds may not breach those terms while using insurance, the Complaint in this case provides no basis for concluding that insureds are under any contractual or other duty to fulfill

---

[20] In the alternative, the insurer and insured might be characterized as co-buyers.  In that scenario, neither could be described as an intermediary of the other and the parties might owe each other certain fiduciary duties in relation to the transaction—though, even accepting such a premise, the existence of such duties would be doubtful given the contractual nature of their co-buyer relationship and there is no reason to believe that any such duties would extend to the prior step of choosing which medication to make the subject of the exchange.

what insurers see as the spirit as well as the letter of their relationship—particularly when deciding, in consultation with a physician, which drugs will best suit their medical needs.

Thus, even though insureds can oblige insurers to pay for certain goods, they do not act as the insurers' intermediaries or agents in those scenarios.  Rather, they act as purchasers and consumers of medical goods and services who have contracted for a certain independent financing mechanism and who will be held to the terms of those contractual agreements if they choose to finance the cost of their market behavior through that insurance scheme.  It would stretch the purpose and precedent of commercial bribery to the breaking point to treat insurer-imposed obligations as the sorts of intermediary relationships that can support a commercial bribery claim due to breach of trust.  *See* Areeda & Hovencamp, XIV *Antitrust Law* ¶ 2362.

In sum, Plaintiffs have not alleged and cannot demonstrate the existence of any fiduciary relationship between insureds and insurers.  In the view of most courts that have addressed commercial bribery, this failing would be enough to grant Defendants' motion to dismiss.  But even if the Court were to prioritize the buyer-seller line and take a broad view of the kinds of relationships that could support a commercial bribery claim, Plaintiffs' allegations do not support the conclusion that insureds act as "agents" or "intermediaries" of insurers.  Nor have Plaintiffs alleged facts demonstrating that insurers are "buyers" in the pertinent sense of that term.  As a result, Plaintiffs' commercial bribery claim must be dismissed.

**V.      Conclusion**

  For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Complaint is dismissed without prejudice as to the benchmark theory of fraud supporting a potential RICO claim.  In all other respects, the Complaint is dismissed with prejudice.  Plaintiff is granted leave to re-plead solely as to the benchmark theory of fraud under RICO within 60 days of the issuance of this Memorandum and Order.

  The Clerk of Court is directed to close the motion entries at Dkt. Nos. 25 and 36.


SO ORDERED.

Dated:  New York, New York
   June 3, 2013

           _____
              J. PAUL OETKEN
           United States District Judge